Case 13-6005, Randy Haight, et al. v. LaDonna Thompson, et al., argument not to exceed 15 minutes per side. Mr. Roth for the appellants. Morning. Morning, Your Honors. Thank you. Jacob Roth for the appellants. I'd like to reserve three minutes for rebuttal, please. Okay. I'd like to start by briefly addressing the Sweat Lodge and Pow Wow claims, which present relatively straightforward applications of existing law, and then I can spend the rest of the time addressing the money damages issue, which is one of first impression in this Court. As to the Sweat Lodge claim, defendants did not satisfy their burden to prove that prohibiting the Native American appellants from accessing any type of Sweat Lodge was the least restrictive means of ensuring prison security. For three reasons, the present record cannot support the grant of summary judgment to the defendants on this issue. First, there's nothing contemporaneous in the record that indicates that security was the real reason why the Sweat Lodge was denied. In fact, the warden in acting on the grievance relating to the Sweat Lodge said- There's that point about monitoring that if you're in a Sweat Lodge, you can't see what's going on. Does that count as a reason? It counts as a reason. It's not contemporaneous in the sense that that wasn't the reason the warden gave when he initially denied the grievance. What about just like an administrative convenience reason? It's just, you know, we don't have these Sweat Lodges anywhere else in Kentucky. It'd just be probably a hassle to have them and have to, you know, fend off requests in the future. Is that not a legitimate or maybe compelling state interest? Well, that is the reason that the warden gave when he denied the Sweat Lodge. I think there are two parts of that to your question, Your Honor. One might relate to cost, which has been held in certain cases to be a compelling interest. But in this case, the Native Americans made clear they were going to be paying for the required equipment and so on. There's also the sort of administrative fact that, yes, if you grant this request, others may have similar requests. That, I don't think, can be a compelling interest under RLUIPA. That's always going to be true in any RLUIPA action. Is there any evidence in the record of the portability of these kind of devices? I know there's some standards in the federal regulation, prison regulations, but it strikes me that a place of assembly, essentially an open room, can be used for what we conceive of as traditional worship ceremonies for any number of traditional faiths. But the construction of a lodge of this kind is fairly unique and not exactly permanent, but certainly a great deal more permanent than voiding the room of its vestments and so forth and bringing in from religion A to switch to religion B, not such a big deal. But this is more mechanically challenging, it would seem. Do you have any comments about that? On that as well, there's nothing really in the record because that wasn't an issue that the defendants addressed. You agree, though, from a common-sense standpoint, it's a question that arises fairly naturally, true? Oh, yes, I think there's certainly a question there. In this case, traditionally sweat lodges are actually outdoors. In this case, the prisoners suggested, I think based on conversations with the warden, that an indoor sweat lodge might be more convenient for the prison, might help address some of the security concerns, and that's why they were talking about doing it indoors. But there really isn't much in the record as to the specifics and the logistics of it, so I would sort of be speculating a little bit. That's certainly something that the prison officials could perhaps develop a record on if that was their ground for denying the grievance, but that wasn't the ground they gave either. For example, if there wasn't a room available, it seems that there was a room available. Again, the warden's concern was, well, others might ask for this at other prisons if we give it to you here, and then we have the— How about just the idea that maybe RLUIPA is supposed to let you do things. The government can't stop you from doing something. That's the exercise of your faith, but it doesn't mean that they're supposed to create things for you. So what about that? I think many RLUIPA cases involve affirmative accommodations, including, for example, special religious diets. Often the prison has to take affirmative action to provide that. In fact, the text of RLUIPA itself specifies that compliance may in some cases require the prison to spend money, for example. I should pull aside for that. So I don't think there's anything in the precedent that draws that type of bright line here. Again, the prisoners here were offering to take care of the costs, to procure the necessary parts and mechanics. So I don't think that would support the grant of some reason. Let me move on to the powwow because the prison has allowed the powwow to go forward, and the claim is that it's a substantial burden in not allowing the Native American prisoners to have certain foods they claim to be central to faith. That's correct. They've had some of those, at least one of those foods, right, the fry bread? That's right. The prison provided the bread. The prison said we're not going to let you purchase using your own funds the other traditional foods that you've requested. And the district court's reasoning was essentially, well, you're getting the powwow, you're getting the bread, so it's not a substantial burden to prevent you from getting the other foods. Respectfully, that's not how the substantial burden analysis works. Courts are not supposed to be determining which parts of a religious practice are important or substantial from a theological perspective. The question is really one of sincerity. Is the motivation for the particular act in question genuinely a religious one? What is it in the record that shows that the buffalo meat and the corn, pemmican, are central to the worship? Well, centrality is not the test either, respectfully, Your Honor. In fact, Ralupa says it doesn't have to be central. Of not having it as a substantial burden. Right. Well, the district court actually, in his opinion, acknowledged that the Native American appellants had alleged that, in their declarations, that having these foods was required. That's what the district court said. So he certainly recognized that that was in the record. His reasoning was, well, it's not a big deal. How do these things work going forward if you win? So you put this affidavit together that says this is important. The judge is not allowed to question centrality. All we have is sincerity, and that's always a jury trial. I don't think it's necessarily always a jury trial, Your Honor. I mean, if it's outlandish, I agree. But don't you think a lot of jury trials? Well, I think that the prison officials are entitled to question sincerity in the first instance. They could build an initial record by, for example, conducting an interview with the prisoner. They could depose the prisoner to ask him some questions. So I don't think it would necessarily always be a question of fact. In many cases, I agree, sincerity would be a question of fact. But the only alternative is to get into the religious question of whether, you know, does this religion, does the orthodoxy of this religion require this particular conduct? How important is it to the religion? And those are questions that the Supreme Court has said courts are not equipped to evaluate. Can I ask you a question about the money damages point? So I don't think this is argued. So this may be something you want to respond to in rebuttal or by supplemental briefing. But, you know, there's a line of cases out there that says when you have one statute, we have one interpretation. So you don't get to mix and match here. So we have Sossaman that says, you know, we've construed appropriate relief against a government. And there's this case, Clark v. Martinez, which is an immigration setting. But it's really a very similar case where the court had adopted one interpretation. The government comes back and says, well, you know, in these circumstances with these people, we think there's a reason for taking the phrase, the word, and giving it a different interpretation. I think that's exactly what's going on here in terms of whether appropriate relief should mean one thing in official capacity suits but something else in individual capacity suits. So, I mean, I have a second concern. But do you have a quick thought about that? Yeah. Yeah, for sure. I think the answer is the word in question is appropriate. Right. Appropriate relief. And the Supreme Court in Sossaman said it's context dependent.  So I think what Congress was doing was saying, well, we're not going to tell you exactly what type of relief is appropriate in every case. We're going to say appropriate relief. That's going to be case by case. And where the defendant is. I like your answer by putting the emphasis on appropriate. But what I would say is the one statute, one interpretation rule would tell us to look at the word relief. And relief across the board means non-money damages. Well, I don't think that's what Sossaman said. I think Sossaman said, yes, money damages are relief. They're not appropriate relief in situations where sovereign immunity is a relevant background principle, where the defendant is a sovereign. But in situations where the defendant is not a sovereign, and the Ninth Circuit's city of Yuma decision addressed this, there the defendant was a municipality, also not protected by sovereign immunity. They said, Judge Kleinfeld's opinion said. Does he look at the one statute, one interpretation rule? I don't recall whether he addressed that in particular. But he certainly acknowledged Sossaman, because the decision was after Sossaman, and said, yes, that the context there, as the Supreme Court said, was the defendant is a sovereign. Here the defendant is not a sovereign, and so what's appropriate is going to change. So I guess the short answer is appropriate is necessarily a word that reflects the fact that in different situations it's going to mean different things. Do you think Congress is trying to do this? Well, it's hard to know what else they were trying to do, because assuming you accept that the statute provides for personal capacity actions, which I think is quite clear from the text, the only relief you could really ever want in a personal capacity action is money damages, because if you want an injunctive relief, you just sue the state directly. The only reason to have personal capacity actions is to get the money damages, and Congress provided not only for suit against the state or state official, but also any other person acting under color of state law, which based on Section 1983 and established civil rights. Would it be for private prisons? Yes, that's true. It could be for private prisons, but that's a relative – I mean, the phrase any other – I mean, that's pretty frequent to have private prisons. I'm not sure if the Supreme Court has ever decided whether they fall within the – Let me just give you this other way of thinking about it. So the thing that's amazing about the Spending Clause is it allows Congress to regulate in areas it could not otherwise regulate. That's not just money damages against states. That's areas where the Commerce Clause might not apply. It's just all kinds of things. So the idea is the state lets them do this because they're not coerced. They're freely taking the money. Congress is allowed to say in return for the money, we're now going to regulate an area we don't normally regulate. Prisons are pretty core state functions. So why do we have to keep this focused on money damages? Why not just say, no, no, Oliver Looper is a very big deal in terms of regulating state and local prisons. So everything about it requires a clear statement, not just money damages. Does that make sense? Well, I guess my answer would be – You're making it sound like the only extra constitutional thing they might be doing here is money damages. And I'm saying, no, no, no, no. This is a big deal. I mean, it's not even obvious to me they have Commerce Clause authority. I mean, inmates don't travel in interstate commerce unless it's a really bad prison. So, right, I mean, I know there's a substantial effects test, but applying that to prisons is really kind of bizarre. May I answer the question? Certainly. I think the answer is, you know, this court in Qatar addressed the – whether the conditions that RLUIPA imposes as a condition on the receipt of federal funds are permissible under Dole, whether they pose a federalism concern and all sorts of other constitutional challenges to the statute as a whole, and rejected those, said, yeah, the condition is fine. So really the only additional question that this case presents is – Congress didn't base its decision to use spending clause on our Qatar decision. It's possible they're at the edge of the line as to what you can do. So the point I'm making is everything requires clarity, not just the money damages part. Well, I mean, I don't think I would agree with that. The statute – I would say the statute does pretty clearly provide for personal capacity suits. The other statutory question is appropriate. It's a phrase that doesn't satisfy clear statement when it comes to money. Well, I think in the context of personal capacity suits, it couldn't mean anything else. And so I think it's – Why can't an individual be enjoined as well as an institution? Don't do that again. Well, you would only need the injunction as against the official because that would carry forward, for example, if the official resigned or someone else took his spot. The injunction would have continuing force. You would not need injunctive relief against the individual. The only time you would ever sue an individual in his individual capacity is to get money damages. So, you know – I think of RLUIPA as a case – it's not classically a statute that turns on money damages, let's face it. I mean, this is about people getting to exercise their faith. They want injunctive relief. That is the key point. They're not coming here for money. That's absolutely right. And I would just point out, under the PLRA, the only money damages they can obtain in any event are nominal damages. Well, that confirms my point. Well, no – Why think about this as a money loss? Well, I think the difficulty is if you do not allow for any monetary relief, even nominal, then there's effectively no deterrent effect in cases where the officials can move the case. 1988 fees. As a former state lawyer, that is a big deal. They'll get 88 fees in all of these cases. But where the officials can move the case, by transferring the prisoner, for example, by revising the policy – I don't understand why transferring a prisoner moves the case. I mean, if you transfer the prisoner and there's a sweat lodge there, yes, that's – you can call it moving a case, but I would call that a victory. And if they move them to another prison where there's not a sweat lodge, they have the same claim. It may not always move the case, but there are certainly many examples. And Justice Sotomayor's dissent in Sassamon lays out a number of them, where courts have held that the transfer does move the claim. And I would just ask your fees point. If the case is mooted, I do not believe you're entitled to fees under 1988. I don't believe that counts as a victory for purposes of obtaining fees. So really the deterrent effect has to be some prospect of monetary relief, even nominal. And I think that explains both why Congress put it in the statute and why the Necessary and Proper Clause would permit it to do so. Okay. Mr. Roth, thank you. Thank you. You will have your full rebuttal. Your Honors. Good morning. Stafford E. Schling for the Connecticut Department of Corrections. I'd like to approach the issues in the same order the opposing counsel did, starting with sweat lodges and working to powwows. I think it's important to note When is the Bureau going to come out with its opinion on sweat lodges? I mean, the suspense is killing us. Yes, Your Honor. I think it's still in consideration. I think there are any number of safety and security concerns that come into play. And the only request that's currently before the Commissioner is the request of the appellants. And the appellant's request sets up a different scenario than any other request for any other Kentucky Department of Corrections inmate. Because the case before the court is not a question of whether Kentucky State inmates can have a sweat lodge. It's a question of whether Kentucky State Penitentiary death row inmates can have a sweat lodge. And the fact that they're all death row inmates enhances and magnifies safety and security concerns for the Department of Corrections. But also, the safety and security procedures that are put in place magnifies the religious concerns of the inmates. Your Honor, I think that the religious concerns would be pretty similar across every security classification level. However, I think it's clear that the State's compelling interest in safety and security is significantly magnified for a death row inmate instead of a minimum security inmate perhaps housed in Bell County Forestry Camp. Accordingly, the minimum security inmate who is deemed to be less of a danger to the facility and the public at large may have an opportunity to get a sweat lodge before the death row inmates do. Death row inmates and the procedure that's used to house and control their actions is substantially heightened over any other security classification in any prison. These are all really good arguments. Where are they in the record in terms of showing why the prison acted the way it did? These are like after-the-fact arguments that make sense. They'd work a lot better, though, if they came from the Bureau or released this opinion and the opinion said we're going to have a rule for death row inmates, we're going to have a rule for others. Yes, Your Honor. We're just lying blind. And I'm assuming that that will be contained in the forthcoming response to the appellant's grievance. Well, what would be wrong with you're losing for now? I mean, it's a compelling interest test. It is a compelling interest test. And when you have the opinion, it gets assessed through the lens of RLUIPA. In the record, there are the affidavits of multiple central office DOC officials, and they set out the safety and security concerns. So they don't do a great job. There's monitoring, which doesn't make a lot of sense. You can put a video camera. I mean, people have to take showers. You have a similar problem there. Those concerns were all specifically considered. They say they haven't done it before. You know, in the Centro Supreme Court case, they completely reject that idea, the idea of, well, we've just never done this before. That's never an explanation that suffices for strict scrutiny. Yes, Your Honor. Sweat lodges have been deemed, every case that's considered them, are essentially inherently dangerous objects. The court in Wren v. Johnson, the Texas – If they're inherently dangerous, why are there so many in so many prisons around the country? It's because the compelling state interest for a minimum or a medium security institution is a less magnified version. Thus, the inmate's religious expression is able to overcome the state's interest in having a sweat lodge. And it's because the safety and security concerns for a medium security inmate are significantly lesser than they would be for a death row inmate. Isn't a lot of your problem here, as Judge Sutton has noted, that the reason that was actually given, initially anyway, was strictly the institution did not want to set a precedent for having these sweat lodges. And if they allow one here, there might be requests at other Kentucky institutions. That was basically the reason given. And the rest of these reasons can be argued to be post hoc. Yes, Your Honor. We disagree with that characterization. But it is true that Warden Parker, in his initial response to the inmates' institutional grievance, set out that they're afraid of setting precedent for the entirety of Department of Corrections. And I think that is a fair assessment, given that the state's interest in safety and security concerns in a prison is at its highest for death row inmates. So essentially, if death row inmates can't have a sweat lodge, anyone else in the Department of Corrections can have one. So you think the affidavits sort of cure the administrative convenience reason that was given? Yes, Your Honor. I think it also establishes sufficient basis for the state's safety and security concerns. I think every case that is considered sweat lodges had determined that sweat lodges proposed substantial safety and security concerns. Like I said, the Wren v. Johnson case does an excellent job of setting out the specific grounds, the safety and security concerns, as does Fowler, which is cited extensively by the district court below and relied upon by the appellees in this brief. I mean, I think there's no question that a sweat lodge creates significant concerns because it is a sacred space where Department of Corrections officials are not allowed to enter. Whether it is in order to generate steam for the sweat lodge, you're dealing with inherently dangerous objects. You're dealing with fire. You're dealing with heated stones. If you go in with an internal or indoor sweat lodge, you're dealing with infrared machines that create any number of dangerous conditions. And there's no way to monitor. That's a good report. Just write it. And, Your Honor, again, that will be forthcoming. Write it. You seem to have a pretty good thought about it. Thank you. I appreciate the compliment from the bench. I'm almost wondering if you're working on it. But it just seems to me, just finish the report. And you all think it may work out perfectly. Yes, Your Honor. And like I said, we are going to issue a report. This is not a not answer and put them off indefinitely kind of issue. We really are going through a fairly extensive safety and security review to determine if we can provide a sweat lodge for Department of Corrections inmates. And if we can provide a sweat lodge, does that method need to change for death row inmates? And it seems, given their status as the most dangerous individuals incarcerated with the Department of Corrections, that it would require a different procedure to handle death row sweat lodges. Yeah, different, but maybe not nonexistent. Any number of cases that have handled this question have determined that. . . Your Honor, I haven't been able to find any. And we've contacted any number of our state counterparts, South Dakota, Texas, Oklahoma, that have a much more organic tradition of Native American religious expression. And none of those facilities have death row sweat lodges. Moreover, Ohio and the federal government have a multi-tiered classification system. And they only allow the bottom three tiers of offenders access to a sweat lodge. So for the analysis for the Kentucky Department of Corrections, it wouldn't just be death row inmates. It would be median security inmates as well. And that encompasses any number of people. So we have not been able to identify. . . So the best of my information, I believe there are no death row inmates anywhere in the country that have access to a sweat lodge. And I think that provides pretty evident proof that. . . It creates any number of safety security signs. But it's just. . . I trust you. You seem like a really trustworthy guy, but. . . Thank you again. It's just words that will now appear in a transcript. It's not even sworn evidence. Yes, Your Honor. And I think all the cases that have been cited by the appellant and relied upon by the court, all are medium or below security sweat lodges. We did extensive review on this and couldn't identify any death row. You've got this Inmate Religious Beliefs and Practices Guide that contemplates sweat lodge access. But I guess what you're saying is it doesn't really address death sentence prisoners. Yes, Your Honor. There is both the federal and the state federal religious practice manual. The Kentucky State Religious Practices Manual is largely derived from the federal manual. And as I said earlier, the federal sweat lodge, they authorize sweat lodges for their inmates, but it's only for the bottom three tiers of security classification. So what's the big deal on the powwow food argument? So it does seem like a pretty good point that the district court was relying on centrality, which we're not allowed to get into. So I think you understand that point. Yes, Your Honor. So that leaves sincerity as to whether they really need these other two food items, and that is pretty classically a fact question. So doesn't this need a little more process? We would argue no, Your Honor. As far as the powwows, we offered and we allowed them to have their traditional foods, though it's another interesting fact question. They're in charge of saying what their traditional foods are. Yes, Your Honor. That's their job. But there really seemed to be no limits or no test to determine whether their belief that the foods are necessary and traditional are actually sincerely held. But if they're going to stand the expense, what difference does it make? It's not even much of an administrative, maybe a marginal administrative, concern about acquiring and conveying the foods, but there could be an administrative charge levied for that as well, I would imagine. Yes, Your Honor. But if they're going to stand the expense out of their prison accounts, what's the problem? Is there a risk in particular in buffalo meat as compared to beef? Not that I'm aware of. I can say that part of the issue is that they – As a matter of fact, less of a – I think it's leaner in less of a – It is leaner in pre-tasting the burger, I'll tell you that. I will say that part of the issue for the buffalo meat and corn pomelican is twofold. One, it's affording groups of inmates benefits that are not available to other inmates, and there's no test to determine whether it really is traditional. That can't be true. Yes, Your Honor. There's a faith that requires a food. I just don't know how else do you do that except supply that one faith group that food. And that's actually one of the reasons we would very much enjoy a sincerely held belief test. For instance, the inmates – What suggests a lack of sincerity? I mean, it's not – they're not asking for filet mignon. I mean, they both at first blush seem to come within the range of what you might have. The reason the buffalo meat and corn pomelican are authorized is because these are deemed traditional familiar foods under the Native American faith. Many of the cases that have been questioned, whether a particular religious item, whether a particular tobacco requirement, whether particular religious rites, all stem from cases that the inmates were longtime adherents to the Native American faith. The court set out specifically that they were raised in the faith since five years old and went all the way up and got to prison and wanted to still embrace their faith. Here, this does not seem to be the fact. For instance, the named plaintiff in this case, Randy Hite, has recently changed his faith again to become a Messianic Jew, to embrace Messianic Judaism. So the question becomes – But that's just a sincerity. I mean, that's not how this case came to us. Yes, Your Honor. I mean, you have the right on remand to win on sincerity grounds. Yes, Your Honor. But that ties into the powwow issue only because what's been denied is the provision of buffalo meat and corn pimmican. Right. There's been no showing that buffalo meat and corn pimmican are, in fact, sincerely held traditional familiar foods under the Native American faith for these particular inmates. Further, there's nothing in – I thought they did say that. You're saying they didn't say that? It's just an assertion, Your Honor. What more would you do? And that's the question. Because as of right now, there's no boundaries. There's no limiting language. So it's just as easy as they say – I think you seem to know a lot about this. One thing to think about with food items or anything used in a ceremony, tobacco, whatever, RFRA and RLUIPA came into being because Congress wanted to overrule a Supreme Court case, which was about providing peyote. Yes, Your Honor. Peyote to Native American Indians. This isn't corn pimmican. This isn't buffalo meat. Peyote. And Congress almost completely unanimously said that was wrong. So having pause about corn pimmican seems really strange in connection with a Congress that's saying Native Americans are entitled to peyote. Yes, Your Honor. If that's part of their religion. In the facts of that case, the plaintiff in that matter was a longtime adherent of the Native American faith and is able to show that the ingestion of peyote was central to his understanding of his religion. Similarly, the tobacco cases that set out the percentage of tobacco that's allowed to be used in the peace pipe ceremony and the sweat lodge ceremony, all are plaintiffs who are longtime adherents of the Native American faith and are able to set out specifically why these particular items are specifically central to their religion. Here, this is buffalo meat. And to the best of the record and the best of our knowledge, these inmates have never actually even had buffalo meat. And there seems to be no way to try to determine whether their belief that they are entitled to buffalo meat is sincerely held or just they saw it in a manual somewhere and they want that benefit. And again, given that there's no requirement that the rite or the ritual be centrally tied or part of the orthodoxy, to use the example I used in my brief, there's nothing that would stop these same Native American inmates from saying that as part of their understanding of a powwow, they must have a Papa John's pepperoni pizza. And there would be no way to distinguish the request for buffalo meat from a pepperoni pizza. And there's no test from the prison standpoint that would allow us to determine whether it's sincerely held, whether it's necessary, whether it's traditional or familiar. We're stuck relying on the inmate's statement, and there's no real test that we can apply without going through the extensive fact-finding necessary for a full trial. Your time has expired. Thank you. We appreciate your argument. Thank you. Mr. Roth? Thank you, Your Honors. Very quickly on the sweat lodge, I think we heard various reasons why a sweat lodge might not be appropriate. But, again, those are not in the record. Glad to hear that the defendants are preparing this report, contacting other prisons to gain insights into their experience. I think the right result for this court at this stage is to vacate the grant of summary judgment, to remand, and perhaps to allow the commissioner a certain amount of time to provide that report, substantiate the record, and then the district court can consider that full record on the merits. With respect to the powwow, I think counsel for defendants was emphasizing sincerity, but, again, sincerity was not questioned in the district court. As to Mr. Hyatt and his religious faith, he's not one of the Native American appellants in the case, so the fact that he changed his religious affiliation is not relevant. There are five plaintiffs. Only three of them are Native American appellants. And counsel also mentioned some merits reasons why the foods might not be able to be provided, but the district court never reached the merits. The district court resolved the case at the substantial verdict level. So we can affirm an alternative ground. Is there something in the record that shows the Native American said, hey, this is part of our faith? Yes. So that's there? It is. They said it was, quote, key to having the powwow. That's at page ID 197 to 200 is the affidavit of Plaintiff Foley, and the other Native Americans have similar affidavits. So that is in the record. Finally, with respect to the money damages issue, Judge Sutton mentioned RFRA and how RLUIPA followed from RFRA. RFRA is understood to provide for personal capacity actions and money damages subject to qualified immunity, which, again, would apply here if money damages are available under RLUIPA. That also would be subject. Are you saying RFRA is applied to the national government? Correct. What case is that? Well, if it's in your brief, it's in your brief. I'm not sure if it is. If it's not, I can provide it to the court. But there are numerous cases, for example, analyzing qualified immunity claims under RFRA. Do they use the phrase appropriate relief? I believe the language of RLUIPA was drawn directly from RFRA. Well, subject to what Judge Cole thinks, I would be eager to see some RFRA cases about that. Sure. All right. I guess we could give both parties an opportunity to submit supplemental letter briefing. Is that fine with you, Judge? Yeah, or just maybe give the State a chance to respond. I mean, it sounds like the plaintiff might have something, and if they do. Okay. Sure, I'd be happy to present that. I mean, the reason most of the courts that have rejected personal capacity actions under RLUIPA have not done so as a matter of the statutory text. They've been relying on the spending clause issue, which wasn't present in RFRA. That's why this hasn't been a focus of the briefing so far, because that just isn't the ground that most courts have been relying on. Judge, would seven days be an appropriate period of time? And the State could respond in seven days or less? Yes, Your Honor. Okay. That would be great. Thank you very much. Thank you very much. The case will be submitted. We appreciate your arguments very much. With that, the clerk may call the next case.